FILED
2026 Sep-01 AM 11:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **SOPHIA LOTESIE MCFARLAND,** | ) | **Case No.:** |
| | ) | |
| **Plaintiff,** | ) | **JURY REQUEST** |
| **v.** | ) | |
| | ) | |
| **THE ARC OF CENTRAL ALABAMA, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

COMES NOW, the Plaintiff, SOPHIA LOTESIE MCFARLAND, and propounds this Complaint to be answered by the Defendant pursuant to the Federal Rules of Civil Procedure.

## I. INTRODUCTION

Sophia McFarland experienced a disabling condition of migraines and she experienced times when she needed leave, whether it was FMLA leave or leave to accommodate her diability for said condition. When McFarland utilized leave, she was disciplined for not completing work while being out or not following policies that were not established. She complained of discrimination, bullying and harassment both internally and to the EEOC. Within days, she was termianted.

## II. JURISDICTION

1. This action for injunctive relief and damages is brought under 28 U.S.C. §§ 1331, 1343(4), 2201, and 2202.

2. The jurisdiction of this Court is invoked to secure protection for and to redress the deprivation of rights caused by the Defendant.

3. This is a suit authorized and instituted under Title VII, 42 U.S.C. 2000(e), *et. seq*., the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq., (ADAAA) and 29 U.S.C. § 2617(a)(2), The Family and Medical Leave Act.

III. **ADMINISTRATIVE EXHAUSTION**

**4.** On or about June 29, 2025, Plaintiff filed a Charge of Discrimination against Defendant and assigned EEOC Charge No. 420-2025-03837. (EEOC Charge attached as Exhibit A).

**5.** On or about June 3, 2026, the EEOC issued the Plaintiff a Notice of Right to Sue. (See Right to Sue attached as Exhibit B).

**6.** Plaintiff files this action wtihin ninety (90) days of her rceipt of her Notice of Right to Sue.

**7.** Plaintiff's claims under 42 U.S.C. § 1981 and the FMLA are not subject to the EEOC administrative exhaustion requirement and are timely filed within the applicable limitations periods for those statutes.

IV. **PARTIES**

8. Plaintiff Sophia Lotesie McFarland ("Plaintiff") is an adult resident citizen of Jefferson County, Alabama, which is located in the Northern District of Alabama, Southern Division. At all times relevant to this Complaint, Plaintiff was an "employee" of Defendant within the meaning of Title VII, 42 U.S.C. § 2000e(f); the ADA, 42 U.S.C. § 12111(4); and the FMLA, 29 U.S.C. § 2611(2), and was a party to an employment contract with Defendant within the meaning of 42 U.S.C. § 1981.

9. Defendant The Arc of Central Alabama Inc. ("Defendant") is, upon information and belief, an Alabama nonprofit corporation with its principal place of business at 6001 Crestwood Boulevard, Birmingham, Alabama 35212, in Jefferson County, within this district.

10. At all times relevant to this Complaint, Defendant was, upon information and belief, an "employer" engaged in an industry affecting commerce within the meaning of Title VII, employing fifty (50) or more employees in each of twenty (20) or more calendar weeks in the current or preceding calendar year, and was similarly a covered entity under the ADA, and FMLA.

## V. <u>FACTS</u>

11. McFarland was employed by Defendant as Coordinatory for the Community Waiver Program.

12. McFarland is African American, colloquially referred to as “black”.

13. During her employment, McFarland's direct supervisor was Lisa McKinnon, who is white.

14. During her employment, McFarland's department supervisor was Adam Tyus, who is white.

15. McFarland suffers from migraines which resulted in back issues that affect her daily life activities.

16. Sometimes McFarland gets dizzy from these migraines, and it would affect her ability to drive clients.

17. During her employment, McFarland suffered from migraine symptoms.

18. In March of 2024, McFarland went to the doctor, and she was diagnosed with intercranial hypertension.

19. McFarland's doctor provided her with restrictions of working from home as needed.

20. McFarland was denied this accommodation even though working from home intermittently was normally an option.

21. McFarland was told she had to take FMLA, but she was not informed she could take it intermittently.

22. McFarland took leave without pay.

23. After McFarland's request for accommodation, she was asked to force another employee to be transferred to another department where she had no experience or a desire to work there.

24. McFarland asked the other employee to move to the other department, but she got upset and declined moving.

25. McFarland was called into the office.

26. Adam Tyus blamed McFarland's headaches for her inability to force the other employee to move.

27. McFarland told Adam Tyus she wanted to follow the policy because it helps her manage her staff better.

28. In September 2024, while McFarland was out having a colonoscopy she received an email from Adam Tyus accusing her of having a lack of concern and urgency to contact Vestavia Bowl.

29. Adam Tyus wanted McFarland to drive over to Vestavia Bowl to get them to come to a CQL meeting.

30. McFarland had previously reached out to Vestavia Bowl by phone but received no response, of which Adam Tyus knew.

31. But McFarland couldn't drive for 24 hours because of the Colonoscopy.

32. That Friday, McFarland received a verbal warning (which is the first step of progressive discipline) stating she did not contact Vestavia Bowl, which was knowingly false.

33. In December of 2024, McFarland discussed a position with Lisa McKinnon that was open.

34. This position would be a promotion for McFarland.

35. Lisa McKinnon said to go ahead and apply for the position.

36. Lisa McKinnon was supposed to sign some papers for McKinnon but told her to apply with HR first.

37. HR told McFarland to get McKinnon to sign the papers.

38. McFarland was able to finally get McKinnon to sign the papers and she applied on December 27, 2024.

39. McFarland was told a decision would be made after the holidays.

40. On Jan. 9, 2025, it was announced the building would be closed the following day for inclement weather.

41. On January 10, 2025, an inclement weather day occurred.

42. McFarland was asked to provide a list of her staff that she supervised indicating which staff would work from home, and which staff would take off.

43. McFarland provided the list.

44. Seven (7) of McFarland's staff took off.

45. Two (2) of McFarland's staff stated they would work from home weather permitting.

46. On January 13, 2025, McFarland was written up (which is the second step of progressive discipline) allegedly for "not have a plan in place for inclement weather day".

47. If an employee has a write up, they are not eligible for promotion.

48. McFarland again asked Adam Tyus for the policy she was alleged to have violated.

49. Adam Tyus said he would get the policy McFarland violated for her, but never did because there is not one.

50. McFarland cannot force employees to come in on inclement weather day when a state of emergency has been declared.

51. Adam Tyus then said McFarland didn't turn in her progress notes on January 10, 2025, the day they were closed for inclement weather.

52. McFarland was at home, and she did not have a scanner at home to send the notes in.

53. McFarland was not provided another way to provide the notes from home.

54. McFarland provided the notes the following open workday as she arrived for work.

55. McFarland received a phone call from Kenya Taylor from the Department of Mental Health.

56. Kenya Taylor explained to McFarland that Lisa McKinnon was calling asking her if McFarland had provided the notes.

57. Kenya Taylor asked McFarland if Lisa McKinnon was her Supervisor, and said, “They are coming for you. This is what they do”.

58. Black employees would quit, and Adam Tyus would not fill their positions.

59. The black employees who quit’s job duties would be distributed to McFarland and another black employee.

60. One of those additional duties McFarland was assigned was community service.

61. McFarland was required to go out in the field to meet with clients, and do her normal job duties as well.

62. There was one incident where I was in field and doing community service when a redetermination meeting occurred.

63. Lisa McKinnon sat in the meeting because McFarland was out in the field performing services that day.

64. Adam Tyus told McFarland she could perform her normal job duties and perform services out in the field, but McFarland asked him how he would like her to do both.

65. McFarland could not be in two places at one time.

66. Lisa McKinnan's assistant, Taylor Fowler (white) put in a request for money.

67. When Defendant denied the money request, Taylor Fowler resigned.

68. But before Taylor Fowler's last day, Defendant offered her more money and she stayed.

69. Defendant created a position for Taylor Fowler.

70. No one really knew what Taylor Fowler's job duties were or what she was responsible for doing when she came back.

71. In February, 2025, McFarland had migraines again.

72. McFarland was off Thursday and Friday, February 6-7, 2025, for the migraines.

73. Sunday, February 9, 2025, McFarland went to the ER who then sent her to follow up with her primary doctor.

74. McFarland received two shots of prednisone in her back and was diagnosed with scoliosis.

75. McFarland provided a copy of her doctor's excuse to my supervisor, Lisa, by text while waiting for her x-rays.

76. Lisa McKinnon texted McFarland back and said someone is here to meet with you.

77. McFarland had not scheduled the meeting, was not part of the meeting, but both McFarland and Lisa McKinnon had been copied on the email.

78. Lisa McKinnon told McFarland she was the Coordinator and she should know who she has a meeting with.

79. McFarland responded she had been out sick and off of work.

80. McFarland always continued to help (work) when she was off by arranging coverage, among other things.

81. McFarland asked to go to Human Resources to discuss and told her she experienced harassment and bullying.

82. McFarland also went to the EEOC intake to complain of discriminatory treatment.

83. On February 14, 2025, McFarland met on teams with HR.

84. McFarland was told she cannot use the terms harassment and bullying.

85. McFarland was put on a PIP until February 19, 24 to ensure progress notes that occurred while she was out for migraines were completed.

86. On February 19, 2024, McFarland was called back in to HR.

87. During the meeting, they acknowledged they received McFarland's notes, but James Darryl (JD) Tilterson told her she was going to be placed on a continuous PIP-otherwise she would be terminated.

88. After the meeting Lisa asked McFarland if she was okay and said because "I like you working here".

89. Lisa McKinnon asked McFarland, "You are not going to leave us are you?" basically acknowledging no reasonable person would tolerate such conditions at work.

90. There was nothing in writing on the extended PIP to establish what job duties needed to be improved.

91. At this point the conditions at work were so intolerable that a reasonable person would have been compelled to resign.

92. McFarland resigned.

93. Her last day was Friday, February 28, 2025.

94. The Thursday before McFarland left, she spoke with the Vice President of HR, Shawn Garner.

95. McFarland told him what JD Tilterson said.

96. Shawn Garner told McFarland JD Tilterson's job was to only listen.

97. McFarland told Garner there was bias which caused a hostile work environment and complained managers say and do what they want to do.

98. Shawn Garner acknowledged the managers cannot say and do what they want to do.

99. Shawn Garner said he had received a call from the EEOC

100. Lisa McKinnon and Adam Tyrus had a history of terminating, demoting or running off black employees.

101. The last director, Sharon Penick (black) was terminated.

102. Another coordinator, Denise Ball, (black) was demoted.

103. Clarrissa resigned because Adam Tyrus ran her off.

104. The pattern was known as former employees Kenya Taylor and Africa Mitchell both told McFarland of the pattern and claimed they were coming for me.

105. But they create positions for white employees like Taylor Fowler.

## VI. **CLAIMS**

### **COUNT I — TITLE VII — RACE DISCRIMINATION (DISPARATE TREATMENT)** *(42 U.S.C. § 2000e-2(a))*

106. Plaintiff incorporates Paragraphs 8 through 105 above as if fully set forth herein, and further states as follows:

107. Plaintiff has established a convincing mosaic of direct and/or circumstantial evidence she was discriminated against based on her race.

108. Plaintiff is Black and is therefore a member of a class protected by Title VII.

109. Plaintiff was qualified for her position, as reflected by her years of service, her supervisory responsibilities, and Lisa McKinnon's approval of her December 27, 2024, promotion application.

110. Plaintiff suffered adverse employment actions because of her race, including but not limited to, the January 13, 2025, written warning that disqualified her from a promotion, the denial of that promotion, the imposition of a Performance Improvement Plan and threatened termination on February 14 and 19, 2025, and her constructive discharge on February 28, 2025.

111. Defendant's stated reasons for each these adverse actions — including, but not limited to, the alleged failure to have an inclement-weather plan and the alleged failure to timely submit progress notes — were pretextual, as no such weather policy existed and Plaintiff submitted her notes as soon as she was able.

112. Circumstances giving rise to an inference of race discrimination include Defendant's pattern of terminating, demoting, or driving out Black employees (Sharon Penick, Denise Ball, and Clarrissa) while creating a new position for a white employee, Taylor Fowler, and redistributing the duties of departed Black employees onto Plaintiff and another Black employee rather than hiring replacements.

113. Defendant's conduct as alleged herein constitutes intentional discrimination against Plaintiff on the basis of her race, in violation of 42 U.S.C. § 2000e-2(a). Defendant's discriminatory conduct was undertaken with malice or with

reckless indifference to Plaintiff's federally protected rights, entitling Plaintiff to punitive damages.

114. As a result of Defendant's violation of the Title VII, Plaintiff has been damaged, suffering loss of pay, benefits, and mental anguish.

## **COUNT II — TITLE VII — RETALIATION** *(42 U.S.C. § 2000e-3(a))*

115. Plaintiff incorporates Paragraphs 8 through 105 above as if fully set forth herein, and further states as follows:

116. Plaintiff has established a convincing mosaic of direct and/or circumstantial evidence that she was retaliated against for her protected activity.

117. Plaintiff engaged in activity protected by Title VII when she reported harassment and bullying to Human Resources in February 2025, when she made informal contact with the EEOC in February 2025, and when she told Vice President of Human Resources Shawn Garner on or about February 26, 2025, that bias was creating a hostile work environment.

118. Defendant knew of Plaintiff's protected activities, as reflected by her initial report of harassment and bullying, and Shawn Garner's statement that he had received a call from the EEOC regarding Plaintiff's complaint.

119. Within days of Plaintiff's February 14, 2025, report of harassment and bullying internally and to the EEOC, Defendant told Plaintiff she could not use those

terms, placed her on a Performance Improvement Plan, and, on February 19, 2025, threatened her with continuous probation or termination.

120. The close temporal proximity between Plaintiff's protected activity and these adverse actions, together with Defendant's shifting and unwritten justifications, establish that Defendant's retaliatory animus was the but-for cause of the adverse actions taken against Plaintiff, culminating in her constructive discharge on February 28, 2025.

121. Defendant's conduct as alleged herein constitutes unlawful retaliation against Plaintiff for engaging in activity protected under Title VII, in violation of 42 U.S.C. § 2000e-3(a).

122. As a result of Defendant's violation of the Title VII, Plaintiff has been damaged, suffering loss of pay, benefits, and mental anguish.

## COUNT III — AMERICANS WITH DISABILITIES ACT — DISCRIMINATION AND FAILURE TO ACCOMMODATE *(42 U.S.C. §§ 12112(a), 12112(b)(5)(A))*

123. Plaintiff incorporates Paragraphs 8 through 105 above as if fully set forth herein, and further states as follows:

124. Plaintiff has established a convincing mosaic of direct and/or circumstantial evidence that she was retaliated against for requesting accommodations for her disability.

125. Plaintiff has a disability within the meaning of the ADA: intracranial hypertension, diagnosed in March 2024 and manifesting in recurrent, severe migraines, and scoliosis, diagnosed in February 2025 following an emergency-room visit — conditions that substantially limit one or more of Plaintiff's major life activities, including neurological and musculoskeletal function.

126. Plaintiff was a qualified individual able to perform the essential functions of her position, with or without reasonable accommodation, as reflected by her continued performance of her Coordinator duties throughout her employment.

127. In March 2024, Plaintiff requested the reasonable accommodation of working from home, consistent with her physician's restriction, and consistent with the work from option option that was, upon information and belief, normally available to other employees, including during the January 2025 inclement-weather closure when staff were permitted to work from home.

128. Plaintiff again asked off from work due to her migraines in February 2025, but her supervisor kept texting her about meetings she had not scheduled and were not to be a part of instead.

129. Defendant subjected Plaintiff to adverse treatment because of her disability, including Adam Tyus's statement attributing Plaintiff's performance issues to her disability ("I just trying to see what is going on with your head. Your

head is not in the game"), the discipline issued to Plaintiff for absences and delays directly caused by the February 2025 migraine/scoliosis episode, and the Performance Improvement Plan and termination threat issued in direct response to Plaintiff's disability-related absence.

130. Defendant's conduct as alleged herein constitutes disability discrimination and failure to provide a reasonable accommodation, in violation of 42 U.S.C. §§ 12112(a) and 12112(b)(5)(A). Defendant's failure to accommodate and disparate treatment were undertaken with malice or reckless indifference to Plaintiff's federally protected rights, entitling Plaintiff to punitive damages.

131. As a result of Defendant's violation of the ADAAA, Plaintiff has been damaged, suffering loss of pay, benefits, and mental anguish.

**COUNT IV — AMERICANS WITH DISABILITIES ACT — RETALIATION *(42 U.S.C. § 12203(a))***

132. Plaintiff incorporates Paragraphs 8 through 105 above as if fully set forth herein, and further states as follows:

133. Plaintiff has established a convincing mosaic of direct and/or circumstantial evidence that she was retaliated against for engaging in a protected activity under the ADAAA.

134. Plaintiff engaged in activity protected by the ADAAA when she requested a disability accommodation in March of 2024.

135. Plaintiff engaged in activity protected by the ADAAA when she requested a known disability accommodation of leave for migraines in February of 2025.

136. Plaintiff engaged in activity protected by the ADAAA when she reported disability-related harassment and bullying to Human Resources in February 2025.

137. Following Plaintiff's February 2025 time off for her migraines, and her report of harassment and bullying connected to her disability-related absences, Defendant placed Plaintiff on a Performance Improvement Plan and threatened her with continuous probation or termination within days.

138. The close temporal proximity between Plaintiff's protected activity and Defendant's adverse actions establishes that Defendant's retaliatory animus was the but-for cause of the adverse actions taken against Plaintiff, culminating in her constructive discharge.

139. Defendant's conduct as alleged herein constitutes unlawful retaliation against Plaintiff for engaging in activity protected under the ADAAA, in violation of 42 U.S.C. § 12203(a).

140. As a result of Defendant's violation of the ADAAA, Plaintiff has been damaged, suffering loss of pay, benefits, and mental anguish.

**COUNT V — FAMILY AND MEDICAL LEAVE ACT — WILFUL INTERFERENCE *(29 U.S.C. § 2615(a)(1))***

141. Plaintiff incorporates Paragraphs 8 through 105 above as if fully set forth herein, and further states as follows:

142. At all relevant times, Plaintiff was an eligible employee under the FMLA, having been employed by Defendant for at least twelve (12) months and having worked at least 1,250 hours during the twelve-month period preceding her need for leave.

143. Defendant was, upon information and belief, a covered employer under the FMLA.

144. In March 2024, Plaintiff was entitled to FMLA-protected leave for a serious health condition (intracranial hypertension) and gave Defendant adequate notice of her need for leave.

145. Defendant willfully interfered with Plaintiff's FMLA rights by failing to designate and inform Plaintiff that intermittent leave was available to her, in violation of Defendant's designation obligations under 29 C.F.R. § 825.300(d)(1) and (e), and by instead requiring Plaintiff to take continuous, unpaid leave.

146. Defendant's failure to properly designate and administer Plaintiff's FMLA leave denied Plaintiff the full benefit and protection to which she was entitled under the Act, including with respect to her subsequent FMLA-qualifying absences for her September 2024 colonoscopy and her February 2025 emergency-room visit and scoliosis diagnosis.

147. Defendant's conduct as alleged herein interfered with, restrained, and denied Plaintiff's exercise of rights protected under the FMLA, in violation of 29 U.S.C. § 2615(a)(1). Defendant's violation was willful.

148. As a result of Defendant's violation of the ADAAA, Plaintiff has been damaged, suffering loss of pay, benefits, and mental anguish.

**COUNT VI — FAMILY AND MEDICAL LEAVE ACT — RETALIATION *(29 U.S.C. § 2615(a)(2))***

149. Plaintiff incorporates Paragraphs 8 through 105 above as if fully set forth herein, and further states as follows:

150. Plaintiff exercised rights protected by the FMLA by taking leave in March 2024 for her intracranial hypertension, in September 2024 for her colonoscopy procedure, and in February 2025 for her emergency-room visit and scoliosis diagnosis.

151. Shortly after Plaintiff's September 2024 FMLA-qualifying absence, Defendant issued her a knowingly false verbal warning for allegedly failing to contact Vestavia Bowl, notwithstanding that Plaintiff had already attempted to do so and was medically restricted from driving.

152. Shortly after Plaintiff's February 2025 FMLA-qualifying absence, Defendant placed Plaintiff on a Performance Improvement Plan and, days later, threatened her with continuous probation or termination.

153. The close temporal proximity between Plaintiff's FMLA-protected leave and Defendant's adverse employment actions, together with Defendant's pretextual justifications, establish that Plaintiff's exercise of FMLA rights was the but-for cause of the adverse actions taken against her, culminating in her constructive discharge on February 28, 2025.

154. Defendant's conduct as alleged herein constitutes unlawful retaliation against Plaintiff for exercising rights protected under the FMLA, in violation of 29 U.S.C. § 2615(a)(2). Defendant's violation was willful.

155. As a result of Defendant's violation of the FMLA, Plaintiff has been damaged, suffering loss of pay, benefits, and mental anguish.

**COUNT VII — 42 U.S.C. § 1981 — RACE DISCRIMINATION**

156. Plaintiff incorporates Paragraphs 8 through 105 above as if fully set forth herein, and further states as follows:

157. Plaintiff has established a convincing mosaic of direct and/or circumstantial evidence she was discriminated against based on her race.

158. Plaintiff is Black and is therefore a member of a class protected by 42 U.S.C. 1981.

159. Plaintiff was qualified for her position, as reflected by her years of service, her supervisory responsibilities, and Lisa McKinnon's approval of her December 27, 2024, promotion application.

160. Plaintiff suffered adverse employment actions because of her race, including but not limited to, the January 13, 2025, written warning that disqualified her from a promotion, the denial of that promotion, the imposition of a Performance Improvement Plan and threatened termination on February 14 and 19, 2025, and her constructive discharge on February 28, 2025.

161. Defendant's stated reasons for each these adverse actions — including, but not limited to, the alleged failure to have an inclement-weather plan and the alleged failure to timely submit progress notes — were pretextual, as no such weather policy existed and Plaintiff submitted her notes as soon as she was able.

162. Circumstances giving rise to an inference of race discrimination include Defendant's pattern of terminating, demoting, or driving out Black employees (Sharon Penick, Denise Ball, and Clarrissa) while creating a new position for a white employee, Taylor Fowler, and redistributing the duties of departed Black employees onto Plaintiff and another Black employee rather than hiring replacements.

163. Defendant's conduct as alleged herein constitutes intentional discrimination against Plaintiff on the basis of her race, in violation of 42 U.S.C. § 1981. Defendant's discriminatory conduct was undertaken with malice or with reckless indifference to Plaintiff's federally protected rights, entitling Plaintiff to punitive damages.

164. As a result of Defendant's violation of the 42 U.S.C. § 1981. Plaintiff has been damaged, suffering loss of pay, benefits, and mental anguish.

**COUNT VIII — 42 U.S.C. § 1981.— RETALIATION**

165. Plaintiff incorporates Paragraphs 8 through 105 above as if fully set forth herein, and further states as follows:

166. Plaintiff has established a convincing mosaic of direct and/or circumstantial evidence that she was retaliated against for her protected activity.

167. Plaintiff engaged in a protected activity when she reported harassment and bullying to Human Resources in February 2025, when she made informal contact with the EEOC in February 2025, and when she told Vice President of Human Resources Shawn Garner on or about February 26, 2025, that bias was creating a hostile work environment.

168. Defendant knew of Plaintiff's protected activities, as reflected by her initial report of harassment and bullying, and Shawn Garner's statement that he had received a call from the EEOC regarding Plaintiff's complaint.

169. Within days of Plaintiff's February 14, 2025, report of harassment and bullying internally and to the EEOC, Defendant told Plaintiff she could not use those terms, placed her on a Performance Improvement Plan, and, on February 19, 2025, threatened her with continuous probation or termination.

170. The close temporal proximity between Plaintiff's protected activity and these adverse actions, together with Defendant's shifting and unwritten justifications, establish that Defendant's retaliatory animus was the but-for cause of the adverse actions taken against Plaintiff, culminating in her constructive discharge on February 28, 2025.

171. Defendant's conduct as alleged herein constitutes unlawful retaliation against Plaintiff for engaging in protected activity under in violation of 42 U.S.C. § 1981.

172. As a result of Defendant's violation of 42 U.S.C. § 1981, Plaintiff has been damaged, suffering loss of pay, benefits, and mental anguish.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following relief:

A. Grant Plaintiff a permanent injunction enjoining the Defendant, its agents, successors, employees, attorneys and those acting with the Defendant and at the Defendant's request from continuing to violate Title VII, Section 1981, the Americans with Disabilities Act; and the Family and Medical Leave Act.

B. Enter an Order requiring the Defendant to make Plaintiff whole by awarding reinstatement to the position she would have had, had she not been terminated;

C. Award back pay (with prejudgment interest), with employment benefits, front pay, liquidated damages; compensatory damages, special damages; punitive damages nominal damages;

D. Attorneys' fees and costs;

E. Plaintiff requests that the Court award Plaintiff equitable relief as provided by law; and,

F. Any different or additional relief as determined by the Court to which Plaintiff is entitled.

**JURY TRIAL DEMANDED**

Respectfully Submitted on August 31, 2026.

*/s/Patricia Gill*

Patricia Gill ASB-0780-I66P

Counsel for Sophia Lotesie Mcfarland

OF COUNSEL:

The Workers Firm LLC
2 North 20th St, Suite 900
Birmingham, AL 35203
T. 205-329-6392
trish@theworkersfirm.com

PLEASE SERVE DEFENDANT AT:
The Arc of Central Alabama, Inc.
Care of Registered Agent William F. Hoehle II
215 21st Avenue South
Birmingham, Alabama 35205.